BALTIMORE & OHIO RAILROAD COMPANY *v.* LILLY BROOKS.
[No. 43, October Term, 1929.]

150

*Decided January 8th, 1930.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Parke, JJ.

*Duncan K. Brent,* with whom were *Allen S. Bowie* and *W. Irvine Cross* on the brief, for the appellant.

*Daniel S. Sullivan,* with whom were *Walter I. Wells* and *Robert C. McKee* on the brief, for the appellee.

Pattison, J., delivered the opinion of the Court.

On September 17th, 1925, the appellee, Lilly Brooks, then Lilly Zake, widow of Arthur Zake, filed her claim for compensation with the State Industrial Accident Commission on account of the death of her husband, who died on the 18th day of September, 1924. In her claim so made, she alleged that Arthur Zake, a machinist, died "as a result of injuries sustained on the seventh day of March, 1923, in the employ of the Baltimore and Ohio Railroad Company," the appellant.

Upon the request of the appellee, a hearing was had on May 17th, 1926, before the commission, to determine the following issues: First: "The deceased, Arthur Zake, committed suicide." Second, "The death of said Zake did not result from accidental personal injuries sustained by the said Zake arising out of and in the course of his employment." The commission found for the appellant on both issues and disallowed the claim of compensation. An appeal was thereupon taken to the Baltimore City Court, where the case was heard and determined by a jury; the issues there being the same as those heard and decided by the commission, that is, first, did the deceased Arthur Zake commit suicide? and second, did the death of said Zake result from accidental personal injuries sustained by him arising out of and in the course of his employment? The answer of the jury to each of these issues, was "Yes," thereby reversing the decision of the State Industrial Accident Commission. Upon the verdict so rendered, a judgment was entered in favor of the claimant for costs. It is from that judgment that the appeal in this case was taken.

In the trial of the case, eight exceptions were taken to the rulings of the court. Seven of these exceptions were upon the admission of testimony and the other upon the prayers.

The evidence discloses that Zake was hurt on March 7th, 1923. After the accident he was carried to the office of a physician, where he was examined, and from there he was taken to his home, where he remained until March 12th, 1923, when he went to the hospital. There he remained for some weeks and returned to his home, but visited the hospital at intervals for examination until August, 1923, when he returned to his work, and thereafter continued to work until April, 1924, when it is claimed he was no longer able to work. In May, thereafter, it was said by his physician, Dr. Nitsch, that he was suffering with tuberculosis of the lungs, also had some mental derangement. Upon the advice of his said physician, he was sent to his father's in the mountains of Pennsylvania, that his condition might be im-

proved. It was while at the home of his father that he, in June thereafter, shot and killed himself.

The main contention of the appellant is upon the court's refusal, in the sixth exception, to strike out certain testimony of Dr. Freedom, an expert witness, who was allowed to state, from all the evidence then offered, that in his opinion the insanity of Zake resulted from the injury received by him, without which the appellant's second prayer, as claimed, should have been granted, asking that the jury be instructed that there was no evidence legally sufficient to show that the insanity of Arthur Zake resulted from accidental personal injuries arising out of and in the course of his employment.

The appellee's witness, Dr. Freedom, was asked: "What, in your opinion, and basing that opinion on the testimony and evidence given in this case, which you say you have heard, was the probable and proximate cause of the insanity from which Arthur Zake was suffering according to your opinion at the time he took his own life?" This question was objected to, but the witness was allowed to answer it. In his answer he said: "When a case is sent to me for diagnosis and for treatment, and this patient is suffering from a very obvious mental disturbance, we always try to determine, if possible, some cause for their mental disturbance. That cause may be due to disease of the brain, or it may be due to disease elsewhere in the body. In questioning the patient, we look first for the presence of venereal disease; we look secondly for the presence of injury or for the history of injury. Now, then, here is a man who up to the time of his accident was perfectly healthy. After his accident he was in the hospital for a certain length of time, came home, and continuously complained. There is absolutely no doubt in my mind but that this man complaining while in the hospital showed some evidence already of a beginning mental disease. * * * Immediately after coming back from the hospital, going home, he was irritable, morose, dangerous, delusions of persecution, people trying to harm him, and people trying to take his wife and harm his children. Now, then, if I had seen him while he

was in the hospital, I possibly would not have known this man was insane. If I had seen him generally from day to day and observed him carefully, the time he was in the hospital and after he got home, possibly with each day I would not be able to say this man was insane. But, observing him from day to day and taking a longitudinal section of the man's life, I could have said very definitely that this man is insane, and, with the history of injury and nothing else, I would have been forced, absolutely forced, to base my opinion on the fact that he has been injured, and, as the result of that injury, now suffers from mental symptoms. That is a very frequent thing in the hospital. It is not at all unusual. We are always seeing cases of individuals who have been hurt, either to their head, or otherwise. We examine those patients, go into the history very carefully, and we find that there is some evidence of injury. And so it was with this poor man, the story of his having been hurt—Mind you, minor injuries do not cause such things. Here is this man caught beneath a half ton boiler, and this half ton boiler very near crushed the life out of him, was prevented from so doing by the fact that there was a block which kept the boiler from actually crushing the life out of him, and you can appreciate not only the actual organic injury which he must have suffered, but also the terrible mental anguish which this man must have suffered until this thing was taken off of his chest, and so it continued up to the time of his death, one mental symptom after another, irritability, people trying to harm him, and on several occasions he actually tried to murder his wife and his children, certainly without cause. We examine different people, we try to determine a cause, if possible. Delusions of persecution like that are exceptionally frequent without cause, that is, as far as we are able to determine; that is, on an unfounded basis. And so it was with him up to the time of this death, up to the time he committed suicide. I am forced to say, since I can find no other reason for his mental symptoms and for his mental malady, I am compelled to say that injury must have been the cause of it."

To this action of the court, in allowing this question to be

asked and answered, the defendant excepted and, the objection being overruled, an exception was noted, which ruling forms the second exception.

He was then asked: "The only testimony of injury here is the injury which happened on March 7th, 1923. Is that the injury which you say was the cause of it, and would you say that was the probable and proximate cause of his mental condition?" This question was objected to, but the witness was allowed to answer it, saying: "Yes, sir." To this action of the court, in allowing the question to be asked and answered, the third exception was taken.

In the course of Dr. Freedom's cross-examination he was asked: "In this history and in this assumption that you made, that it must have been the injury that caused this derangement, what concretely was the injury that you assumed occurred and on which your testimony is based? A. I assume that this man was caught under this half ton boiler, and that his chest and his abdomen, of course his back too, because he was squeezed in this thing, not that he was necessarily crushed, as far as his tissues were concerned—that is, his bones were not broken, nor his muscles torn, nor lacerated, but this thing caught him and squeezed him * * * Q. What is the kind of squeezing you mean? A. A squeeze that came with a good deal of suddenness, sufficient to cause a very rapid and severe increase in inter-thoracic and inter-abdominal pressure." When asked to explain his answer, he went to the black board and attempted to illustrate what he meant and, at the conclusion of his answer, he said to the counsel for the defendant "Does that answer it?" and was told by him it did not. Whereupon the witness was asked: "Do you assume in your testimony that this man's chest was squeezed? A. I would assume so; yes, sir. Q. I am asking you to answer that yes or no? A. Yes, sir. Q. What change was made by the squeeze that affects the brain? A. That is very simple affair. Any very sudden extensive increase in inter-thoracic pressure, the venous blood, that is, the blood from the right side of the heart, is suddenly sent back through * * * its venous tree, sufficient to cause numerous small extravasations of blood

out of the smaller blood vessels and so called peri-vascular hemorrhages. Q. Therefore, you tell this jury that the reason you connect the injury as the cause of Zake's mental derangement is because he had a squeezing of his body, particularly of his chest, sufficiently great to force the circulation, that is, to force the blood up into his brain * * * sufficient to cause a breaking of the blood vessels in his brain? That is true, isn't it? A. Yes, sir."

The evidence which had been given at the time Dr. Freedom was upon the stand, in any way bearing upon the character of the injury suffered by Zake, and the manner in which it was inflicted, was first, the testimony of Zake's wife, who said he told her "he was working underneath a smoke box and he was on the frame of the engine with an air hammer working under this smoke box, and one of the men on the other side of this engine moved the blocks, and when they moved the blocks, this smoke box and the frame of the engine caught him, doubled him up like that (indicating) and one of the workmen pulled him out with this part of his body first and this smoke box was crushing him on his back and the last place it struck was on top of his head." Second, the statements made by Zake as disclosed by the hospital charts. In the first of these, made upon his admission to the hospital on March 12th, 1923, it is said "Injury being due to a boiler falling on him" and that "he was caught between a boiler and disc plate injuring his back," and in a later chart, that "he sustained a crushing injury on March 7th, 1923." Third, the testimony of Grimes, who did not see the accident but was told that "it was the outer tongue frame of a key wound engine, I judge it would weigh around half a ton, from what I was shown. I didn't see it, but from what they told me it was cut loose and lying up on top of the cylinder, and he was taking the cylinder ends off the cylinder and he happened to be laying across it and something occurred that one end jumped up," and they "claim there were some small blocks that laid across it and kept from catching him between the boiler and crushing him to death." Fourth, the testimony of Rowena O. Harrison, director of claims of the State Indus-

trial Accident Commission, in which she testified that Zake filed his claim for compensation "and was awarded eighteen dollars per week from March 11th, 1923, to August 4th, 1923," and that in his claim, he, speaking of his injury, said it occurred while "taking cylinder off engine, engine tilted and wedged me under engine, contusing my back."

After the plaintiff had concluded her testimony, James P. McCann, a helper to Arthur Zake at the time of the injury, who was along side of him, about a foot from him, the only person who saw the accident, and consequently the only one able to explain just how it occurred, was asked: "Now, will you, in your own way, tell the jury just what happened? A. If you understand the workings of the engine I can easily explain it. We were taking the bolts out that go through the smoke box and the cylinder; he was on the frame tongue which rests on top of the frame back of the cylinders and goes over the top of the cylinders to the front, or what we call the deck. He was sitting on the frame tongue and reaching over, loosening the nuts on the cylinder, when the bolts through the frame tongue was sheered off and the front came down and caught him on a jar. * * * I pulled him out of there. Q. What difficulty did you have in pulling him out? A. No difficulty whatever. Q. Was there any pressure from the thing which had failed to stop you pulling him out? A. Not a particle. Q. You are able to say that? A. I am, positively. Q. And you do say so? A. I do. Q. You used the expression that whatever part of the engine it was, I don't know, caught him like a jar. Where did that catch him? A. Across the back, across the kidneys more." And when asked to indicate to the jury, he did so by placing his hands across the back, over the kidneys, the small of the back. "Q. How about his chest? A. No, sir; his chest was not touched. Q. How about the head and shoulders? A. Could not touch his shoulders or head." He further testified that no one helped him in taking Zake from the position mentioned. The witness also testified that the thing that struck Zake weighed four or five hundred pounds. It dropped two or three inches only. In dropping that distance it struck him on the back as

explained by him, though it did not knock him down; it merely jarred him.

When asked by one of the jurors what held the smoke box up off of Zake he said: "It was impossible for it to come down any further. Q. What held it up? A. The whole weight of the engine back of it. (Juror): This sheared the bolts of the engine and dropped? A. Dropped. (Juror): And was he free? A. He was not jammed. (Juror): Was he free to go with it? A. He was. (Juror): He was not laying on anything here where he could be pinned? A. No. (Juror): Where did he land when it knocked him down? A. It did not knock him down. (Juror): Where did you pull him out of? A. He was underneath the smoke box working in there. Q. And after this thing dropped, what happened? A. Then I pulled him out of there. (Juror): Was he injured? A. No, did not appear to be injured. (Juror): When you took hold of him then, was the thing still resting on his back? A. No. Q. It never did rest on his back, did it? A. No, sir. I could not have pulled him out of there if it had been resting on him. (Juror): I just wanted to ask you, Mr. McCann, you say you pulled him out? A. Yes. (Juror): Without any weight upon him at all? A. That is right. (Juror): In other words, when the box fell several inches it naturally caught against that frame and could not fall any further? A. Could not."

After the introduction of McCann's testimony, Dr. Edmunds, surgeon-in-chief of the Baltimore & Ohio Railroad Company, testified that on March 12th, 1923: "Arthur Zake walked into the ward (of the hospital) with the assistance of some friends, and stated that he had been injured at Mount Clare, on March 7th, 1923, at which time he had been caught between a boiler and something else; that between March 7th and 12th, 1923, he stated he had been at his home under the care of Dr. Schweinberg, a Baltimore & Ohio Railroad surgeon; that Dr. Schweinberg is dead, that Zake was put to bed and all of his clothing was removed." That he examined him and could find no evidence of injury excepting the complaint that he made of a great deal of pain in the lower part

of his back. He was then asked: "What about marks on his body? A. His back did not move to the extent that one would ordinarily expect. There were no markings, there were no deformities, there were no discolorations and no evidence of any kind that he had received an injury, excepting his statement that he had received one, and that his back pained him a great deal. That an X-ray examination of his entire spine, which took in his chest, was made, and that this was negative for injury, but it did show a condition known as osteo-arthritis, and called infectious arthritis of the spine, and which is spoken of by the laity in the generalized term as rheumatism of the back; that his temperature was negative; * * * that Zake showed no evidence of injury except his pain; he was not shocked, and there was no evidence of hemorrhage and nothing to account for the pain excepting the arthritis of his spine, and the injury which he is said to have had; that he was a poorly nourished individual; that his mouth was filled with teeth that were infected, decayed, exuding pus, which the witness thinks was the cause of the arthritis; that the witness put Zake to bed and watched him and took care of him generally; that he did not get well at all; that he developed a headache; that Zake's temperature at that time was normal; that he constantly complained of the pain in his back and his headache; that on or about March 27th he began to run a temperature, a fever, practically two weeks after he had been in the hospital; that the witness could find no reason for the temperature; that prior to this, witness had had Dr. Maldeis make a blood picture, which was negative, and that, after talking to Zake's wife, who said there were four or five children at that time down with typhoid fever at home," his attention was called to the fact that possibly Zake had typhoid fever and that a blood culture and Widal test for typhoid were made. That the Widal test for typhoid was positive, the blood culture negative. Whereupon he issued typhoid precautions and the patient was placed under typhoid treatment. That he gradually got better and, on May 5th, 1923, he was discharged from the hospital, free of fever. At intervals thereafter he came back to

the hospital for general observation, and that on June 5th, 1923, he stated his back would not let him go to work and that he was feeling badly and up-set generally. He was asked at this time: "Do you have your headaches now? A. No, I do not have my headaches; it is my back that gives me trouble." He never saw him after that time.

Witnesses produced by the appellee had testified that after the accident Zake became irritable and disagreeable in his associations with his family, when he had before been pleasant and agreeable, and after the accident he thought people were disposed to injure or persecute him, when, in fact, they had no such intentions. On the other hand, evidence produced by the appellant showed that Zake had acted in the manner stated, and had entertained such suspicions, long before the happening of the accident. That if he were to see two persons talking he would, at the end of their conversation, go to one or both of them, and tell them that in such conversation they were talking about him or discussing him unfavorably, thereby showing a dislike or unfriendly feeling for him.

It was after all this testimony was in that the appellant's counsel made the motion to strike out the evidence of Dr. Freedom to the effect that the insanity of Zake was the result of the alleged injury received by him. This motion was over-ruled and the action of the court thereon forms the sixth exception, to which we have above referred. The court was asked to grant this motion on the ground that the conclusion reached by Dr. Freedom that the insanity of Zake resulted from the injury received was not based upon facts found in the evidence, but upon assumption of facts not shown to exist therein. In explaining how the insanity of Zake was connected with the injury received by him, the witness stated that from the evidence he reached the conclusion "that Zake received a pressure, either upon the chest or abdomen, of sufficient force to cause the blood therein to suddenly go to the brain, thereby causing a rupture of one or more of the blood vessels of the brain." He said, however, in connection with this statement or explanation, that minor injuries do not and would not produce this result.

It is urged by the appellant that there is no evidence in the case showing that there was a pressure either upon the chest or abdomen of sufficient force to produce the result stated by the witness, but that he assumed, for the basis of his conclusion, facts that did not exist, or at least not shown by the evidence to exist, where he says "This man caught between a half ton boiler which very near crushed his life out of him, was prevented from doing so by the fact that there was a block which kept the boiler from actually crushing the life out of him and you can appreciate not only the actual organic injury which he must have suffered, but also the terrible mental anguish which this man must have suffered until this thing was taken off his chest."

Dr. Freedom had no personal knowledge as to how the accident occurred, nor of the nature and extent of Zake's injury, as he made no examination of him to ascertain the character and extent of his injuries. The evidence given by him was expert, or opinion, testimony, which under the well established rule of law must be based on facts proven in evidence. As said in *Northern Central Rwy. Co. v. Green,* 112 Md. 505, "A hypothetical question must embrace every material element of the hypothesis founded upon the evidence, and it must not import into the question any element not founded upon the evidence in the case. If it offends in either respect it is defective and it is error to permit such a question to be answered, and if inadvertently admitted over an objection, it is error to refuse a motion to strike out the answer." *Berry Will Case,* 93 Md. 560; *Balto. & O. R. Co. v. Dever,* 112 Md. 296.

In this case, Dr. Freedom was present in court and heard the evidence offered, which fact made it unnecessary to insert, in the question asked him, every material element of the hypothesis founded upon the evidence, which would have been essential had he been absent and not heard the evidence. *City Pass. Ry. Co. v. Tanner,* 90 Md. 315. This fact, however, does not change the established rule that only facts which are produced in evidence shall be considered by him in stating his conclusion.

The witness has exaggerated the character and extent of the injuries, as shown by the evidence. There is nothing in the evidence to show that his life was nearly crushed out of him, or that he remained under a half ton boiler until it was lifted from his chest. It was not even shown that his chest became involved by the fall of the smoke box, or whatever may have been the object that fell, nor was there anything to show that this heavy object was lifted from him. The fact that the object did not rest upon his chest or any other part of him is shown from the evidence of McCann, who not only denied that fact, but says that he pulled Zake from the position he was in without any difficulty whatever, which he could not have done had the heavy object mentioned been resting upon him.

There was a space between the object above him and the one below him. The size of this space is not shown by the evidence, but he was working within that space, reaching over in a stooping position. How far his back was from the object above him is not shown from the evidence, yet the space was not so lessened by the fall of that object as to cause him to be crushed or squeezed between it and the object below. The fact that he was not so pressed or squeezed is further shown by the testimony of Dr. Edmunds, who examined him only a few days after the accident, in which he testified "there were no markings, there were no deformities, there were no discolorations, and no evidence of any kind that he received any injury." It was thus shown from the evidence, we think, that Zake was not pressed or squeezed in any way, so as to produce the result mentioned by the witness Dr. Freedom, though the basis of his conclusion that the injury caused the insanity was upon an assumed fact that Zake's body was squeezed, particularly his chest, "sufficiently great to force the blood up into his brain, thereby causing a rupture of a blood vessel" therein.

The motion, therefore, we think, should have prevailed, and the evidence of Dr. Freedom that the insanity of Zake resulted from the injury should have been excluded, and,

with this evidence out, it follows that the second prayer of the defendant, by which the court was asked to instruct the jury that there had been offered "no evidence legally sufficient to show that the insanity of Arthur Zake resulted from an accidental personal injury, arising out of and in the course of his employment," should have been granted.

Having reached this decision, we think the other rulings of the court need not be reviewed and passed upon.

*Judgment reversed, without a new trial, with costs to appellant.*