492 A.2d 1270

Phyllis YOUNG

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY.

No. 46, Sept. Term, 1984.

Court of Appeals of Maryland.

May 31, 1985.

184

Jack F. McGarvey of Towson, and Charles S. Sandler of Baltimore (Hegarty and McGarvey of Towson, on the brief), for appellant.

G. Macy Nelson, Baltimore (Anderson, Coe & King, Baltimore, on the brief), for appellee.

Re-Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (Retired), Specially Assigned.

RODOWSKY, Judge.

This case involves the exclusivity of the workers' compensation remedy as a defense to a damage suit. Appellant, Phyllis Young (Young), a workers' compensation claimant, allegedly attempted suicide because she had been examined by a psychiatrist who evaluated her condition at the request

of the employer's insurer. She sued the insurer in tort for damages on theories of negligence and intentional infliction of emotional distress. Judgment was for the insurer on demurrer and Young appealed. We issued certiorari on our own motion prior to review by the Court of Special Appeals, 300 Md. 151, 476 A.2d 720. We shall affirm as to negligence and reverse as to the intentional infliction of emotional distress.

In her two count declaration filed in the Eighth Judicial Circuit on September 2, 1982, Young alleged the following basic, *i.e.*, nonultimate, facts which we set forth chronologically.

April 15, 1978—Young, an employee of House in the Pines Nursing Home, is assaulted at work.[1] The appellee and defendant below, Hartford Accident and Indemnity Company (Hartford), was the workers' compensation insurer of the employer. Young "sustained physical and *emotional* trauma as a result of the assault." (Emphasis added.)

May 18, 1978—The Workmen's Compensation Commission (the Commission) orders the employer and insurer to pay temporary total disability, to provide medical treatment "[p]romptly," and to "[f]ile a statement of compensation paid with the Commission upon ceasing the payments made under" the May 18, 1978, order.[2]

June 18, 1978—Young's temporary total disability terminates, as later determined by the Commission's order of May 10, 1979.

---

1. Young's counsel at argument advises that the assault arose out of an altercation.

2. Under the purported authority of former Maryland Rule 326 Hartford demanded that Young produce certain written instruments referred to in her declaration. Without objection, Young in response produced copies of two Commission orders. The two Commission orders have, under the rule, become incorporated into Young's declaration and our recital of the allegations tested on demurrer includes matters disclosed by the orders.

November 10, 1978—Young's second period of temporary total disability begins, as later determined by the Commission.

November 14, 1978—Young's attorney requests Hartford to authorize treatment for emotional illness by Dr. Alan Peck under whose care Young had come after initial treatment by two other physicians. Hartford refuses so to authorize despite its never having had Young examined by a psychiatrist nor its having any medical information to indicate lack of a causal connection between the assault and the psychiatric condition.

February 5, 1979—Dr. Michael Potash examines Young at the request of Hartford and advises Hartford that Young "should continue on the psychiatric care."

February 27, 1979—Young's second period of temporary total disability ends, as later determined by the Commission.

April 16, 1979—The Commission holds a hearing which Young had requested in order to have her medical bills paid. Young is still under the care of Dr. Peck. Hartford's proof shows that Young is in need of medical care.

May 10, 1979—The Commission enters an order which, *inter alia,*

(1) fixes the dates of the first and second periods of temporary total disability;

(2) orders the employer and Hartford to "provide medical treatment unto the claimant and reimburse the claimant for prescriptions;" and

(3) holds "for further consideration ... whether [Young] sustained a permanent partial disability, if any," with the case to "be reset only on request...."

After May 10, 1979—Young remains under the care of Dr. Peck. Hartford refuses "to pay a portion of his bill although required to do so by order of the Commission...."

August 17, 1979—Dr. Peck advises Hartford that Young "had attempted to commit suicide and any pressure by [Hartford] for an outside medical evaluation would only put

more tension on her and lead to a collapse." Hartford nevertheless insists upon another evaluation, to be performed by Dr. John Henderson. "[I]n order to pressure [Young] into submitting to another [psychiatric] examination [Hartford] refused to pay any further temporary. total disability payments, or medical expenses."

September 5, 1979—Dr. Peck advises Hartford that "any pressure by [Hartford] for a second opinion by a psychiatrist of its own choice would throw [Young] over into a psychosis or severe depression and suicide."

September 7, 1979—"[A]s a direct result of [Hartford's] insistence," Dr. John Henderson examines Young and advises Hartford that Young is temporarily, totally disabled and that the disability is compensable. Hartford does not thereafter pay Young's medical bills despite the custom among workers' compensation insurers to pay medicals that are supported by a report by an examining physician of the insurer's selection.

Sometime during the relevant period—Young speaks by telephone to Hartford's adjuster who tells Young that she is "crazy, and 'if it was up to me you would not get a penny.' "

September 11, 1979—Young attempts suicide.

September 19, 1979—Young is admitted to a psychiatric hospital where she remained under inpatient and outpatient treatment for approximately three months. Young's pleading is silent as to whether the insurer paid for this care.

In count I of her declaration Young alleged that, in light of Hartford's knowledge of Young's prior suicide attempts and the warnings by Dr. Peck, Hartford was negligent in insisting upon a medical examination. Further, "as a direct result of [Young's] being required to undergo the examination by Doctor Henderson, [she] was caused to attempt to commit suicide...."

Count II contains additional allegations. There Young charges that Hartford "in an attempt to reduce its monetary exposure by getting [Young] to commit suicide, or in the alternative to drop her claim, entered into the [there-

after described] course of action to [effect] that result[.]" She asserts that "the sole purpose of Doctor Henderson's examination was to harass [her] into abandoning her claim, or into committing suicide." Hartford's conduct is said to have been "intended to inflict emotional distress upon [Young] in order to cause her to drop her claim or commit suicide...."

This is not a case where a compensation claimant asserts that tort damages are recoverable based on nonpayment or late payment of compensation. Young's declaration does repeatedly allege that Hartford failed to pay her medical expenses and that the failures violated Commission orders. The Commission's orders, with respect to medical expenses, simply embody the obligations which are imposed on the employer and which are assumed by the insurer. *See* Md.Code (1957, 1979 Repl.Vol.), Art. 101, title, "Workmen's Compensation" (the Act), § 37(a). The thrust of Young's allegations about Hartford's failure to pay medical bills, however, is that Hartford pressured her economically to present herself for a further psychiatric evaluation. As Young's counsel stated at the original oral argument, her claim "does not arise out of the failure to pay compensation benefits but arises out of the injury she sustained as a result of the insistence of the insurance company that she be examined again."

Hartford's position that compensation is Young's exclusive remedy ultimately rests on that portion of § 15 of the Act which reads:

Every employer subject to the provisions of this article, shall pay or provide as required herein compensation ... for the disability or death of his employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment....

The liability prescribed by the last preceding paragraph shall be exclusive....

Young on the other hand argues that the injuries sued upon arise out of an incident which is separate and distinct from

the initial work-related assault so that any medical expenses and disability resulting from the second incident are not covered by the Act. In part I of this opinion we shall consider these contentions with respect to the declaration's first count, sounding in negligence. Part II of this opinion addresses the intentional infliction of emotional distress allegations of count II.

# I

## A

The first question is whether Young's injuries which are the basis of this tort suit are sufficiently work related to be covered by the Act. The injuries result from self-infliction. Section 15 of the Act, on which Hartford relies, makes compensation payable "except where the injury is occasioned by willful intention of the injured employee to bring about the injury or death of himself...." And *see* § 45 ("[N]o employee ... shall be entitled to receive any compensation ... on account of any injury ... caused by self-inflicted injury....").

■■■ This Court has held that, depending on the circumstances, death benefits under the Act may be paid where the worker has in fact committed suicide. *See Baber v. Knipp & Sons*, 164 Md. 55, 163 A. 862 (1933). In that compensation case we reversed judgment entered on a directed verdict in favor of the employer. To determine whether the worker's death arose out of and in the course of his employment, we applied a proximate cause test to the relationship between the death and the accidental injury. We said that, with respect to workers' compensation cases, " 'proximate cause' means that the result could have been caused by the accident, and that there has not intervened, between the accident and the result, any other efficient cause." *Id.* at 67, 163 A. at 867. Application of that test to the facts in *Baber*, including improperly excluded evidence, resulted in a jury question whether the industrial accident caused the decedent's mental illness which in turn caused

the death by suicide. The same rationale was applied in *Baltimore & Ohio R.R. Co. v. Brooks*, 158 Md. 149, 148 A. 276 (1930). In that case, however, an erroneous premise of the claimant's expert's opinion rendered it incompetent to establish the causal connection between the accidental injury and death by suicide. In any event, the fact that the declaration before us admits that the plaintiff's injuries are self-inflicted in an attempted suicide does not, in and of itself, mean that Hartford's exclusivity argument is foreclosed.[3] A suicide attempt is not always an intervening cause which breaks the nexus between the accidental injury and the injury suffered in the suicide attempt. The issue turns on the facts in a given case.

We have also applied a proximate cause test in other factual situations to determine whether, following an initial injury which was clearly compensable, a second injury was also compensable. For example, in *Great Atlantic & Pacific Tea Co. v. Hill*, 201 Md. 630, 95 A.2d 84 (1953), we affirmed a finding that a causal connection existed between a work-related leg fracture and a subsequent fracture of the same bone at the same place which occurred more than three years after the work-related injury and which was unassociated with any trauma. *Unger & Mahon, Inc. v. Lidston*, 177 Md. 265, 9 A.2d 604 (1939) affirmed a judgment on a jury verdict which had found to be compensable the disability resulting from a broken hip suffered by the plaintiff while climbing the steps to his home. The plaintiff had previously injured his ankle at work. The hip injury occurred while the plaintiff was returning home after having purchased medicine. There was evidence from which the jury could have found that weakness in the injured ankle caused the plaintiff to fall on the occasion of the second injury. The claimant in *Williams Construction Co. v. Garrison*, 42 Md.App. 340, 400 A.2d 22 (1979) suffered

---

**3.** Hartford makes no argument to us in this tort suit based on contributory negligence and we intimate no view on the operation, if any, of that defense in cases of self-inflicted injury.

injuries in a forty foot fall from a ladder while working as a tree trimmer. Five months earlier, when the claimant was working for a different employer, he had fallen from a tractor and suffered a compensable injury. On the compensation claim based on the second injury, summary judgment for the claimant, rendered on the record before the Commission, was affirmed. Factually, the uncontradicted evidence there was that dizziness resulting from the first accident caused the plaintiff to fall from the ladder on the second occasion. Legally, there was no intervening cause despite the employer's argument that the claimant's having climbed a ladder when he knew he was subject to dizziness constituted a willful injury.

The same rule obtains where the claimant, as the result of malpractice by a physician engaged to treat the initial work-related injury, suffers an aggravation of the original injury. *See Nazario v. Washington Adventist Hospital, Inc.*, 45 Md.App. 243, 412 A.2d 1271 (1980), holding that the insurer's subrogation interest applied to the recovery in a third-party action against health care providers and rejecting the claimant's contention that the malpractice action was an entirely separate claim from the compensation claim. And *see* 1 A. Larson, *The Law of Workmen's Compensation* § 13.21 (1985) (Larson).

■ The facts in Young's declaration, now before us, state a causal nexus between the assault at work and the injuries suffered in the suicide attempt with the result that the later injuries arise out of and in the course of Young's employment. It is true that Young alleges that her injuries "were caused solely by the negligence of [Hartford]." Assuming that this allegation is one of fact, it conflicts with other allegations reviewed below. Conflicts in allegations are resolved against the pleader. *See Read Drug and Chemical Co. v. Colwill Construction Co.*, 250 Md. 406, 416, 243 A.2d 548, 555 (1968).

■ Young avers that she was assaulted at work as a result of which she suffered physical and emotional trauma.

She says she requested Hartford to authorize treatment for emotional illness, that she obtained her own psychiatrist, and that when she submitted the bills rendered by that psychiatrist to Hartford, Hartford failed to pay them although required to do so. These allegations in effect say that Young's emotional disability is covered by the Act. Young then alleges that her treating psychiatrist warned Hartford that she might commit suicide if she were again medically evaluated on behalf of the insurer. Finally, Young avers that her attempted suicide was the result of Dr. Henderson's examination. But, significantly, there is no assertion in count I that Dr. Henderson conducted his examination in other than a medically correct manner. Rational persons do not ordinarily react to a medically proper psychiatric evaluation by attempting suicide. It necessarily follows that count I describes a suicide attempt brought about by an irrational reaction to the psychiatric examination, and the only emotional infirmity alleged by Young is the one which she says is compensable.

Consequently, the allegations set forth an unbroken chain of proximate causation which continues from the emotional trauma suffered in the assault arising out of and in the course of Young's employment on to and through the attempted suicide. Under Young's pleading the injuries suffered in the suicide attempt are an aggravation of the work-related injury. Under the allegations, the entire emotional illness is compensable under the Act. The next question is whether Hartford, which is not the employer, enjoys an exclusivity defense to Young's negligence claim.

### B

Hartford sees this phase of the case as controlled by *Flood v. Merchants Mutual Ins. Co.*, 230 Md. 373, 187 A.2d 320 (1963). We agree. In that case a compensation claimant filed a common law suit against his employer's insurer alleging that the insurer (1) had been negligent in its selection of physicians to treat the claimant's injuries in violation of the statutory duty to provide medical care and

(2) was liable under *respondeat superior* for the negligence of the physicians. Judgment for the insurer, entered on demurrer, was affirmed. We said that, under the Act, the General Assembly "intended the insurance carrier to stand in the position of the employer." *Id.* at 377, 187 A.2d at 322. We said that this was "nowhere better demonstrated than in" § 58 of the Act, which deals with third-party actions. *Id.* The insurer, under circumstances therein described, may assert the common law liability of a third party to the compensation claimant. We cited cases decided under the Federal Employee's Compensation Act, the Longshoremen's and Harbor Workers' Compensation Act, and the workers' compensation acts of California, Idaho, Oklahoma, and Pennsylvania holding that claimed negligent medical treatment of an injury, compensable under those acts, could not be the basis for a tort suit. We held that the insurer was not a third party under § 58.

This holding was applied in *Donohue v. Maryland Casualty Co.*, 363 F.2d 442 (4th Cir.1966), *aff'g* 248 F.Supp. 588 (D.Md.1965). For reasons stated in the District Court's opinion, the Fourth Circuit held that the Act's exclusivity provision barred a tort suit against an insurer whose allegedly deficient inspection was said to have violated the employer's common law duty to furnish the plaintiff-employee with a safe place to work.

Young suggests that later cases decided in other jurisdictions have eroded the *Flood* rule. In support Young refers to Larson, § 72.86. That section discusses intentional torts committed by the insurer in investigating compensation claims. More appropriate to the negligence count of Young's declaration is the discussion beginning at § 72.90 of Larson concerning third-party actions against insurers "based usually on alleged negligence in either safety inspections or medical services." *Id.*, at 14–265. In this line of cases Larson sees a "welter of cross-currents and violent disagreements" and stresses that the law on the subject "is still in a formative stage." *Id.* At § 72.96 Larson discusses those cases which look to what the insurer was doing

(the functional approach) in order to determine whether the exclusivity of the compensation remedy bars a negligence suit against the insurer as a purported third party. Larson classifies *Flood* as representing the functional approach. He says that *Flood* "held that the insurer, in selecting and providing a physician, was performing a duty imposed on the employer by the compensation statute, and therefore should obtain the employer's immunity." *Id.*, at 14–296.[4] Larson's suggested solution of the problem of carrier liability for negligence, presented at § 72.97, is this:

> [A] distinction should be drawn between the carrier's function of *payment* for benefits and services, on the one hand, and, on the other, any function it assumes in the way of direct or physical performance of services related to the [Act]. For negligent performance of the latter it should be liable in tort as a "person other than the employer." [*Id.*, at 14–302 (emphasis in original).]

■ Using Professor Larson's suggested solution, as we read it, would make no difference in the result under count I of Young's declaration. In this connection we shall assume that the referral by Hartford of Young to Dr. Henderson for an examination and report is properly to be classified as claims investigation activity by the insurer, even though a substantial argument could be made that such examinations and evaluations may contribute to diagnosis and treatment as well. Claims investigation is one of the services which the employer buys from the compensation insurance carrier. Young's declaration treats Dr. Henderson as an independent contractor *vis-a-vis* Hartford. Hartford did not render the subject claim evaluation service through its employees for Young's employer. Consequent-

---

4. As explained, *infra*, we need not express agreement or disagreement with Larson's characterization of *Flood*. The opinion in *Flood* does say, in part: "It goes without saying that when the Legislature by statute authorized employers to contract with insurance companies in order to cover possible claims under Article 101 it intended the insurance carrier to stand in the position of the employer." 230 Md. at 377, 187 A.2d at 322.

ly, even under the test suggested by Professor Larson, benefits under the Act would be the exclusive remedy for Young against Hartford under count I. As to count I we hold that the trial court properly entered judgment for Hartford.

## II

In count II Young undertakes to state an intentional tort theory, specifically, the tort of intentional infliction of emotional distress. Count II raises two questions: (1) whether a case sounding in intentional infliction of emotional distress has been well pleaded and, if it has, then (2) whether the Act provides the exclusive remedy when that tort is committed by an insurer under the circumstances set forth in count II.

## A

■ The Maryland law of the tort of intentional infliction of emotional distress is set forth in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). The four elements of the tort are:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

[*Id.* at 566, 380 A.2d at 614.]

In describing in *Harris* what conduct is "extreme and outrageous" we quoted favorably from comment *d* of Restatement (Second) of Torts § 46 (1965) to the effect that " '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harris, supra,* 281 Md. at 567, 380 A.2d at 614. And *see Prosser and Keeton on the Law of Torts* § 12, at 60–61 (W. Keeton 5th ed. 1984). *Harris* also

cautioned that each element of the tort must be established by proof in order that "two problems which are inherent in recognizing a tort of this character can be minimized: (1) distinguishing the true from the false claim, and (2) distinguishing the trifling annoyance from the serious wrong." 281 Md. at 566, 380 A.2d at 614.

Restatement, *supra*, § 46, comment *g* states a further limitation on the tort.

The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.

Looking next to the facts alleged by Young in count II reveals two levels of intentional conduct charged to Hartford. Hartford's conduct is intentional in the sense that it was warned that an examination by Dr. Henderson would cause Young emotional distress but Hartford nevertheless proceeded. Count II superimposes on those allegations a further charge that "the sole purpose of Doctor Henderson's examination was to harass the Plaintiff into abandoning her claim, or into committing suicide." This additional allegation escalates the level of intentional conduct.

The declaration does not state a cause of action of intentional infliction of emotional distress simply by charging that Hartford insisted on a further examination knowing that it would cause Young emotional distress. Hartford had a right to insist on having Young again examined by a physician of its choice in order to evaluate Young's then current condition.[5] In the compensation case there had

---

5. At a minimum, Hartford had a right to apply to the Commission for an order pursuant to the authority conferred on the Commission by § 42 of the Act. It provides:

Any employee entitled to receive compensation under this article is required, if requested by the Commission to submit himself for medical examination at a time and from time to time at a place

been no resolution of the question of permanent disability, if any. Further, the nature of the disability involved is elusive. According to the Commission's findings, Young had moved into and out of two separate and relatively short periods of temporary total disability. If count II alleged no more than we have set forth in this paragraph, the tort of intentional infliction of emotional injury would not be well pleaded because Hartford could not be liable for insisting upon its legal rights in a permissible way. *See* Restatement, *supra*, § 46, comment *g*.

The privilege recognized in comment *g* was applied on analogous facts in *Steadman v. South Central Bell Telephone Co.*, 362 So.2d 1144 (La.Ct.App.1978). The case arose on demurrer. The plaintiff alleged that she had become disabled and was unable to continue working for the defendant. Some months thereafter the defendant discontinued disability benefits which caused the plaintiff severe mental distress. Later, despite repeated warnings from the plaintiff's physician that the defendant should not contact the plaintiff under any circumstances, employees of the defendant telephoned the plaintiff and on one occasion visited her at home in order to regain her employee identification and key cards which had been issued to her by the defendant. Judgment for the defendant was affirmed because "these acts would be privileged as a matter of law under these particular circumstances, as defendant did no more than to assert its legal rights of regaining the identification and key cards in a permissible way." *Id.* at 1146.

▮▮▮ But, because of Young's additional allegations, count II does state a cause of action of intentional infliction of emotional distress. If Young proves that "the sole purpose of Doctor Henderson's examination was to harass

---

reasonably convenient for the employee and as may be provided by the rules of the Commission. If the employee refuse[s] to submit to any such examination, or obstructs the same, his right to compensation shall be suspended until such examination has taken place, and no compensation shall be payable during or for account of such period.

the Plaintiff into abandoning her claim, or into committing suicide," a jury could find that that proof meets all of the elements of the tort as set forth in *Harris, supra,* 281 Md. at 566, 380 A.2d at 614. It would also mean that the privilege recognized in comment *g, supra,* would not apply. If the "sole purpose of Doctor Henderson's examination" is proven and found to be as alleged, then the physician conspired with Hartford to harass Young into abandoning her claim or into committing suicide because the allegation excludes any proper medical or claims-evaluation motive for the examination. Under such a finding Hartford would not have been exercising its legal rights in a permissible way. Conversely, if Dr. Henderson is found to have conducted a bona fide examination, the privilege would apply, even if Hartford intentionally proceeded knowing the examination would cause Young such severe emotional distress as to satisfy the elements of the tort. We therefore hold that the "escalated level" of intentional conduct alleged in count II states a case of intentional infliction of emotional distress.

## B

The remaining issue is Hartford's contention that, even if Young has properly pleaded an intentional tort by the insurer, the plaintiff's remedy remains exclusively compensation under the Act. The answer depends on the reach of § 15 of the Act which makes the liability to pay compensation exclusive "for the disability or death ... resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment...." Because of the continuity of Young's physically disabling and compensable emotional injury through the suicide attempt, the § 15 test was satisfied in count I where an aggravation of that injury was alleged to have been negligently inflicted. That conclusion does not follow with re-

spect to the intentional tort alleged in count II.  At a minimum, count II does not allege an "accidental" injury.[6]

The availability to an insurer of the exclusivity defense depends on identifying the insurer with the employer under circumstances where the employer would be liable only for compensation and not for tort damages.  Where an employer intentionally inflicts work-related injury on the employee, the employee may hold the employer liable for tort damages as provided in § 44 of the Act.  It in part provides:

> If injury or death results to a workman from the deliberate intention of his employer to produce such injury or death, the employee ... shall have the privilege either to take under this article or have cause of action against such employer, as if this article had not been passed.

Where, as here, we deal with an injury which, if negligently inflicted, could be remedied only by workers' compensation, it is both logical and fair to borrow as the limit on the application of exclusivity as to insurers the same limit expressly established in § 44 on the scope of exclusivity as a defense for employers inflicting the same injury.  We hold that at least one way in which an insurer can become liable for damages for an intentional tort committed on a claimant is if the injury to the claimant results from the deliberate intention of the insurer to produce such injury.

Young's count II pleads a claim which satisfies the analogy to § 44.  The allegation that Hartford intended, by insisting on the examination, to cause Young to commit suicide if she did not drop her claim, states a deliberate intention to produce the injury sued for.  The standard borrowed from § 44 coincides with the intent prong of the first element of the tort of intentional infliction of emotional distress.

---

**6.** In *Gallagher v. Bituminous Fire & Marine Ins. Co.*, 303 Md. 201, 492 A.2d 1280 (1985), we discuss the elements of arising out of and arising in the course of the employment in connection with an exclusivity defense to alleged intentional torts.

In reaching our holding we reject the following argument advanced by Hartford. Because § 44 refers only to an employer, and not to an insurer, Hartford asserts that the exclusivity defense available to an insurer under *Flood* is not removed by any provision of the Act. Consequently, says Hartford, an insurer is liable only for compensation benefits whether it has injured an employee negligently or with the deliberate intent to produce such injury. If Hartford is correct and the Act gives unlimited scope to the exclusivity defense insofar as insurers are concerned, then the Act creates greater protection for insurers than employers because employers may be liable in tort for work-related injuries produced by their deliberate intention, but insurers would not be liable in tort for similarly produced injuries beyond workers' compensation benefits. This is a disparity of treatment which the General Assembly could not have intended.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED IN PART AND AFFIRMED IN PART AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.