607 A.2d 8

**KENTUCKY FRIED CHICKEN NATIONAL MANAGEMENT COMPANY, et al.,**

v.

**Serita J. WEATHERSBY.**

**No. 75, Sept. Term, 1991.**

Court of Appeals of Maryland.

June 9, 1992.

Robert M. Bell, J., dissented and filed an opinion in which Eldridge, J., joined.

Patricia A. Dunn, argued and on brief (Richard F. Shaw, George T. Manning, and Nancy C. Lee, Jones, Day, Reavis & Pogue, on brief), Washington, D.C., for petitioners.

Alan Banov, argued and on brief (David Fishman, on brief), Washington, D.C., for respondent.

Lawrence S. Lapidus, Chaikin & Karp, P.C., Gary Simpson, Bruce Fredickson and Woodley B. Osborne, Rockville, for Maryland Employment Lawyers Ass'n and Metropolitan Washington Employment Lawyers Ass'n, amici curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

This case presents us with a claim of intentional infliction of emotional distress. Serita J. Weathersby contends that her former employer, Kentucky Fried Chicken National Management Company (KFC), and Lee Watts, an area manager for KFC, treated her so outrageously that they should be held accountable under the stringent standards we apply for this exceptional tort. A jury in the Circuit Court for Montgomery County found in her favor and awarded her $145,000 in damages.[1]

Judge Vincent Ferretti, Jr., granted KFC's motion for judgment notwithstanding the verdict on the intentional infliction of emotional distress claim. He found that there was no evidence that KFC's conduct had been sufficiently atrocious to justify a verdict on this tort theory. Among the factors Judge Ferretti considered was that there was "no evidence that anybody knew that this employee suffered from any emotional condition" that made her especially vulnerable. The Court of Special Appeals reversed, holding that Weathersby had proved intentional infliction of emotional distress. *Weathersby v. Kentucky Chicken Co.,* 86 Md.App. 533, 587 A.2d 569 (1991).

In its decision, the intermediate court decided that there was evidence to show that KFC and Weathersby's immediate supervisor "were in a unique position to know or they reasonably should have known, based on [her] personality, character, integrity, and pride in her managerial position and work, that their conduct could have impacted significantly and detrimentally upon her." 86 Md.App. at 555, 587 A.2d at 579.

---

1. Weathersby had also contended that KFC was guilty of race discrimination and breach of contract. The jury, however, found for KFC on those allegations.

KFC petitioned this Court for a writ of certiorari on the following question:

"Should an employee who has a nervous breakdown in response to receiving a demotion from her employer be permitted to recover for intentional infliction of emotional distress when the employer had no knowledge the demotion would cause the nervous breakdown?"

We granted the writ and shall reverse the Court of Special Appeals.

### The Facts

 When reviewing a trial court's decision to grant a defendant's motion for judgment notwithstanding the verdict, an appellate court must view the evidence in the light most favorable to the plaintiff and resolve all conflicts in the plaintiff's favor. *Lehman v. Balto. Transit Co.*, 227 Md. 537, 540–541, 177 A.2d 855, 857 (1962). Therefore, we present the facts of the case from Weathersby's point of view.

In October, 1987, Weathersby became a training store manager at a KFC operation in Wheaton, Maryland. She was as an at-will employee, and her immediate supervisor was Lee Watts, whose managerial duties encompassed five KFC stores in the region.

Before Weathersby's arrival at the Wheaton store, KFC began installing interchangeable core locks in its Washington area locations. Such locks, which are opened by keys, are placed in the middle of existing locks and can be removed and replaced whenever necessary. Each time a core lock is changed, a different key is required to open it. KFC policy called for new locks at a store when there was a change in management personnel; core locks made this security measure more cost-effective than if the entire locks had to be replaced. Watts changed the Wheaton store's locks on October 27, 1987, but not after that despite further management changes there.

That month, Watts and an assistant manager at the Wheaton store allegedly began a romance despite company policy discouraging such liaisons. After Weathersby confronted Watts about the relationship and registered a complaint with the company, she said that Watts started harassing her. The harassment included making her work about 15 days straight in December, ordering her to get a promotional banner put on the roof without the help of a maintenance man, phoning her at home on her day off, and assigning her substandard assistant managers.

On January 14, 1988, David Offutt, one of the assistant managers, opened the Wheaton store and found $1,644 missing from the safe. He called Weathersby, who reported the theft to Watts. There was no evidence that either the store or the safe had been forced open, so the investigation focused on those who had access to the establishment and the safe's keys and combination.

Six days later, Watts told Weathersby that she and two assistant managers were scheduled for polygraph tests. Weathersby objected, but Dave Davis, KFC operations manager for the Baltimore–Washington region, insisted that she undergo the procedure. She took the test on January 25, 1988. The next day Weathersby asked Watts if he had told the polygraph examiner that he (Watts) had not changed the store's locks since the previous October; she also asked him why he had not scheduled a lie detector test for himself and others who could open the safe.

On January 27, Weathersby met with Watts and Pete Davis, regional security director for KFC. She informed Davis that Watts knew that the locks had not been changed for nearly three months; she also told him about Watts' romance with the assistant store manager. A day or so later, Weathersby came to a managers' meeting at another restaurant, where Watts took away her store keys and, in front of customers and other employees, suspended her for ten days "pending an investigation" of the missing money. Weathersby learned later that the suspension was without pay.

On February 7, 1988 Watts told Weathersby that she was being demoted to assistant manager for "serious misconduct." When she questioned him about the nature of the misconduct, Watts responded that it had to do with the locks not being changed. As part of the demotion, Weathersby's salary was cut by $11,000, and she was assigned to a store managed by someone she had once supervised. Two days later, Weathersby sought psychiatric help, and the following month she was hospitalized for what turned out to be a six-week stay. She never returned to work.

"Her hospitalization was as a result of severe depression, homicidal as well as suicidal thoughts, relating to her work situation," according to testimony of Dr. Louis E. Kopolow, a psychiatrist who treated Weathersby. "I believe her dismissal from work significantly contributed to the development of the major depressive illness." Dr. Kopolow related that Weathersby "indicated that much of her symptoms were precipitated by her being fired from her employment as well as the conditions around that termination." [2]

In the course of treating Weathersby, Dr. Kopolow dealt with what he saw as "borderline personality traits [that] reflected a higher degree of rigidity in terms of her personality...." She saw things as wrong or right, proper or improper. Weathersby, the doctor observed, "had difficulty in seeing the middle ground in terms of her failing as well as the failings of others, and this tended to cause her a great deal of distress in terms of her dealings with the world." Dr. Kopolow testified that "past events in her life would impact on her behavior, her coping skills, her flexibility, and her vulnerability." In Weathersby's past was a traumatic incident: when she was 11, her mother shot her step-father to death and then pressured her to say that the killing was in self-defense instead of the premeditated act it

---

2. Dr. Kopolow's information about Weathersby's employment problems, of course, comes from Weathersby herself. His discussion of her "termination" comes from her statements to him about what happened.

was. Weathersby was told that if she did not support her mother's version of the event, not only would she lose her father, but her mother would have to go away to prison. That incident, Dr. Kopolow observed, "had a very powerful impact in terms of her upbringing and in terms of a greater sense of vulnerability." Weathersby's history and "mind-set," he concluded, "contributed to the onset of her depression and suicidal ideation."

Dr. Kopolow said that the murder of her step-father was not an "overwhelming" issue for Weathersby and that the childhood incidents did not cause her to be suicidal or unable to work. Nevertheless, he acknowledged that the discharge summary at the end of Weathersby's stay in the psychiatric facility showed that the shooting incident "has impacted on" Weathersby and caused "her great concern with regard to her present situation and her homicidal feelings towards her employer."

Weathersby, Dr. Kopolow testified, exhibited "a tendency to be very demanding of herself and demanding of others, and not show the flexibility of realizing that people cannot always do everything right all the time. She tended to have problems seeing the grays, both in actions of others and in herself." Borderline personality traits such as Weathersby's "might well be exhibited by a zealous performance of activity, an inability to tolerate mistakes in her own performance or that of others. In a more severe response to failure, feeling that she had to succeed, because to not succeed left only one alternative, which was absolute failure. Such individuals can go far, but they face high risk of slipping, because there is no net. I mean they go all the way down."

Borderline personality traits, Dr. Kopolow advised, would not necessarily be noticed by an employer, provided everything went smoothly on the job.

### The Law

Quite recently, this Court reviewed the elements necessary to sustain a claim for intentional infliction of emotional

distress. *Batson v. Shiflett,* 325 Md. 684, 734–35, 602 A.2d 1191, 1216 (1992). We need not repeat them again. In *Batson,* we reemphasized that the tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct. *Id. See Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *Restatement (Second) of Torts* (hereinafter the *Restatement* ) § 46 cmt. d (1965) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in· a civilized community"). The general rule that emerges from caselaw

> "is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. The requirements of the rule are rigorous, and difficult to satisfy."

W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 12, p. 60–61 (5th ed. 1984) (footnotes omitted) (hereinafter, *Prosser* ).

When considering the question now before us—whether the defendant must have had knowledge of the plaintiff's delicate emotional state to be accountable in the instant case for causing her emotional distress—we keep in mind that the basic issue is the behavior of the defendant. Was it indeed abominable? One author noted that "the tort, despite its apparent abundance of elements, in practice tends to reduce to a single element—the outrageousness of the defendant's conduct." Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Col.L.Rev. 42, 42–43 (1982). He further stated:

> "The extraordinary feature of the tort ... is its insistence upon 'extreme and outrageous conduct.' In fact, this element is, in large respect, the entire tort. It both limits the reach of the tort and dominates the proof of its

elements. The outrageousness requirement means there is no liability simply for the intentional infliction of emotional distress. If a defendant intends to cause a plaintiff emotional distress and succeeds in doing so, the defendant is nonetheless *not* liable unless his or her conduct is also extreme and outrageous. While intending to inflict emotional distress on another (particularly a person whose susceptibility is known to the defendant) is often outrageous, it need not be."

82 Col.L.Rev. at 46 (emphasis in original, footnotes omitted). The primary focus on the outrage aspect of this tort shows that its dominant concern is the defendant's conduct rather than the plaintiff's right to compensation. 82 Col.L.Rev. at 54. "[T]he outrageousness requirement means that we must first determine whether the defendant is deserving of condemnation; if so, plaintiff must be compensated, if not, plaintiff recovers nothing. [¶] ... This tort, born of concern for our interest in emotional tranquility, most unambiguously furthers the punishment and control functions of tort law." *Id.* (Footnote omitted).

Given this purpose, it becomes apparent that a defendant's knowledge of a particular individual's emotional sensitivity can be an important factor in establishing liability. If a defendant meant to prey upon the known weaknesses of another human being, his or her behavior is more likely to warrant condemnation than if he or she had been unaware of the other's particular vulnerability. The aspect of censure in this tort is better suited to conscious behavior than to negligence. The tort clearly requires "intentional infliction" of emotional distress.

The *Restatement* specifically emphasizes the outrage requirement in Comment f of § 46, when it discusses an actor's knowledge that a particular individual is more likely than most to be emotionally affected by certain behavior:

"The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The

conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."

The Arkansas Supreme Court focused its attention on a defendant's awareness of a plaintiff's susceptibility to emotional stress in *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). In that case, Johnny Dale Bone, the manager of a Radio Shack outlet, sued his employer for emotional distress he suffered during an investigation of irregularities at his store. Bone had suspected his assistant manager of stealing, and he sent a memorandum to his supervisor complaining of his subordinate's unsatisfactory conduct. Bone had been told twice that some practices in the store were less than satisfactory. Bone's supervisor and two security people descended on the store one morning to investigate and questioned Bone at 30–minute intervals throughout the day. Bone claimed that they threatened him, cursed him, and twice refused to allow him to take medication during the questioning. The subordinate testified that he had admitted to investigators that he was guilty of theft and that he had been immediately fired.

That afternoon, Bone was asked to submit to a polygraph examination. He agreed but said he wanted permission to take his medication—the tranquilizer Valium—because of his agitated state. His request was denied because the medication might affect the test results. Bone was brought to another place for the testing, but he hyperventilated and had to be taken home. Although he returned to work the next day, he was unable to remain on the job. Eventually he was hospitalized after seeking the help of a psychiatrist. According to psychiatric testimony in his emotional distress suit against his employer, Tandy Corp., Bone suffered from a personality disorder that made him more susceptible to stress and fear than those without the disorder.

The court found that the way in which the investigation had been handled was not sufficiently outrageous except for one factor: Bone's reaction to stress and his request for Valium put the employer on notice that he "may not have been a person of ordinary temperament, able to endure a stressful situation such as he was placed in without injury." 678 S.W.2d at 316. The court emphasized "that the notice to the employer of Bone's condition is the only basis for a jury question of extreme outrage." 678 S.W.2d at 317.

The Arkansas court reinforced its reasoning in *Tandy Corp. v. Bone* four years later in *Ingram v. Pirelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103 (1988), a case involving a manager, William Ingram, who claimed his supervisors had carried on a campaign to harass him over many months. The alleged harassment included orders to fix a machine even if it meant staying on the job all night, being the only department manager commanded to pick up telephone messages for his workers no more than five minutes after they were received by the switchboard and getting them to the workers within another five-minute deadline, and being asked to sign a job description as electrical department manager, a lower position from which he had been promoted more than a year before.

Two fellow employees testified that they knew that the plant manager and Ingram's immediate supervisor "were putting pressure on" him, and one said that the supervisor openly worried that Ingram might sue if the pressure continued. In affirming the trial court's directed verdict for the defendants, the Arkansas Supreme Court said,

> "The foregoing evidence reflects a serious conflict or dispute between [Ingram] and his supervisors, and while we believe the supervisors' conduct was petty, insulting and less than one might expect from manager level executives of a reputable firm, we cannot agree such conduct was outrageous."

747 S.W.2d at 105. The court then drew a distinction between Ingram's complaint and Bone's, emphasizing that conduct in the latter case "would not be outrageous, except

the employer knew Bone was under extreme emotional stress at the time...." *Id.* The evidence presented in *Ingram* revealed "nothing that reflects the [company] or its supervisors ... had knowledge that [Ingram] was peculiarly susceptible of emotional stress." 747 S.W.2d at 106.

> "Although [Ingram] and his wife related that he had experienced stress, chest pains and sleepless nights when dealing with the pressures foisted upon him by his supervisors, there is nothing in the record that shows he informed [the company] of these stress-related problems."

*Id.*

In *Mellaly v. Eastman Kodak Co.*, 42 Conn.Supp. 17, 597 A.2d 846 (1991), a Connecticut court recently held that an employee's allegation of outrageous conduct was sufficient to go to a jury, because he claimed that his employer had used his history of alcoholism to badger him. Hubert J. Mellaly was employed by Kodak and supervised by a man named Robert Kane. Mellaly contended that Kodak knew before he was hired that he was a recovering alcoholic and had abstained from drinking for about eleven years. Kane used this personal history to taunt him, telling him to "go get drunk." Kane also indiscriminately yelled and screamed at Mellaly about his recovery from alcoholism, saying that no one cared about it and that he had better not speak about his recovery to customers. In addition, Mellaly said Kane harassed him by (1) often calling him at home on his days off or during his vacation, (2) expressing myriad resentments and ill feelings, and (3) attacking Mellaly's need for medical tests in 1987 and his medical treatment after a fall on the job two years later.

The court rejected Kodak's motion to strike the intentional infliction of emotional distress count. "Within the context that Kane supervised [Mellaly] *and knew of his disease of alcoholism,* Kane's conduct reached the required threshold of outrageousness. It is, therefore, an issue for the trier of fact." 597 A.2d at 848 (emphasis added). *See Wangen v. Knudson,* 428 N.W.2d 242, 248 (S.D.1988) (De-

fendant knew that plaintiff was being treated for severe depression.). *See also Bundren v. Superior Ct. of County of Ventura*, 145 Cal.App.3d 784, 193 Cal.Rptr. 671, 674 (2d Dist.1983) (Rude and insolent debt collector is not liable unless other factors are present, such as "knowledge that the debtor is susceptible to emotional distress by reason of some physical or mental condition."); *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo.App.1982) (Vendors who sold car at a loss liable for bullying buyer into giving back the vehicle. They had been told that the buyer had watched her husband kill himself and was crazy; that knowledge made their conduct outrageous); *Anderson v. Prease*, 445 A.2d 612, 613 (D.C.App.1982) (Defendant-doctor cursed and screamed at plaintiff-patient; since doctor knew that patient "was peculiarly susceptible to emotional distress, his conduct was extreme and outrageous under the circumstances."); *Dawson v. Associates Financial Serv. Co. of Kan., Inc.*, 215 Kan. 814, 529 P.2d 104, 113 (1974) ("[M]ethods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis.").

■ Although it is a factor in evaluating a defendant's conduct, the mere fact that a defendant knew that a plaintiff was particularly susceptible, however, does not require a finding that the defendant's conduct was outrageous. For example, in *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), the court reviewed a claim by Charles G. Oxford, a management employee at a Sterling division, that the company had engaged in a systematic campaign to force his resignation because he was suspected of being a whistleblower. Company officials suspected Oxford of reporting Sterling to the General Services Administration for pricing violations that eventually led the firm to pay a $1,075,000 settlement to the federal government. Oxford was told that his position, manager of contract sales, would be eliminated in a company reorganization; he

accepted appointment as district sales manager, a relatively low-level post. A company official also wrote him an "EEO" letter, a tactic used to set up an employee for firing, despite being warned that the timing was bad because Oxford was then under serious personal pressure. In the letter, Oxford was told he would have to conduct floor care demonstrations five nights each week after normal business hours. Oxford also claimed that he had been reprimanded for acts he had never done and that he had not received stock won in a company sales contest.

The court referred again to its *Tandy Corp. v. Bone* decision, noting that it had "placed special emphasis on the fact that even though the employer knew of the employee's lower than normal emotional stamina, it refused to permit him to take his medication during the interrogation." 743 S.W.2d at 382. "Sterling's conduct continued over an eighteen month period," the court found. "In addition, there is ample evidence that agents of Sterling knew that Oxford was under severe pressure because of a recent divorce. Nevertheless, Sterling's conduct did not rise to a sufficient level to support a verdict for outrage." 743 S.W.2d at 382–83. *See Byrnes v. Orkin Exterminating Co., Inc.,* 562 F.Supp. 892, 896 (E.D.La.1983) (Employer knew of employee's psychological assessment showing him to be "rather emotional" and "sensitive to criticism." Still, this knowledge did not make defendant realize "to a virtual certainty" that mental anguish would result from his behavior, which included cursing the employee, embarrassing the employee in front of coworkers, and taking over employee's sales presentations.); *District of Columbia v. Thompson,* 570 A.2d 277, 291 (D.C.App.1990); *reh'g granted and vacated on other grounds,* 593 A.2d 621 (D.C.App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991) ("[A]cts which are not generally considered outrageous may become so when the actor knows that the other person is peculiarly susceptible to emotional distress." Defendant's actions were not outrageous as a matter of law because evidence showed only that defendant knew plaintiff "was

unhappy with, or perhaps despondent about, the criticism she was receiving from her supervisor.").

There are some situations in which courts recognize that the parties' relationship to each other can help determine whether the acts complained of are outrageous. It is only natural that a defendant's position of power over a plaintiff may enhance his or her ability to do harm. The *Restatement* recognizes this reality in § 46, Comment e:

> "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. Thus an attempt to extort money by a threat of arrest may make the actor liable even where the arrest, or the threat alone, would not do so. In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous."

Although the *Restatement* does not specifically say that employer-employee relationships are governed by this rule, some courts have held or implied that they are. *See, e.g., Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal. Rptr. 88, 90 n. 2, 468 P.2d 216, 218 n. 2 (1970), discussed in *Harris v. Jones,* 281 Md. 560, 569–570, 380 A.2d 611, 615–16 (1977); *Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 448 (1985); *White v. Monsanto Co.,* 585 So.2d 1205, 1209–10 (La.1991); *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173, 1176 (1977).

Treatises have recognized this development. *See* Lee Lindahl, *Modern Tort Law—Liability & Litigation* (rev. ed. 1988), § 32.03, at 133–135; *Prosser* (1988 Cum.Supp.), at 18; Fowler V. Harper, Fleming James, Jr., and Oscar S. Gray, 2 *The Law of Torts* § 9.1, at 608–609 (2d ed. 1986). In their multi-volume 1987 work, Stuart M. Speiser, Charles F. Krause, and Alfred W. Gans note that courts in many states "have considered the employer-employee relationship

*a significant factor* in determining whether [there is] liability for the tort of" intentional or reckless infliction of emotional distress. 4 *The American Law of Torts* § 16.21, at 1094 (emphasis added). Speiser, Krause, and Gans add, however, that no general rule on liability can be gathered from the varied decisions in which employers were held legally accountable for inflicting emotional distress. *Id.* at 1095.

We agree that the employment relationship is a factor to be considered when analyzing whether an employer's behavior was so outrageous that he or she has committed the tort of intentional infliction of emotional distress. That does not mean, however, that this Court wishes to lower the threshold for determining liability whenever the parties are employer and employee. The conduct must still reach the same degree of outrageousness if an employee is to prove that his or her employer has committed this tort; the employment relationship is merely one factor among many to use in analyzing individual cases.

"The existence of a relationship between a plaintiff and a defendant, by which defendant possesses actual or apparent authority to damage plaintiff's interests, does not relieve plaintiff of the burden of proving the extreme and outrageous nature of defendant's conduct."

*Owens v. Second Baptist Ch. of La Grange,* 163 Ill.App.3d 442, 114 Ill.Dec. 557, 562, 516 N.E.2d 712, 717 (1987), *appeal denied,* 119 Ill.2d 559, 119 Ill.Dec. 388, 522 N.E.2d 1247 (1988) (Fired pastor brought action against church and its officers for breach of employment contract and intentional infliction of emotional distress; appellate court held that trial judge should have directed verdict against pastor.) In fact, the employer-employee relationship may not always inure to the employee's benefit in claims for intentional infliction of emotional distress. Citing *Ingram, supra,* the Arkansas Supreme Court said it takes "a strict view of claims for outrage in employment situations.... This is because an employer must be given a certain amount of latitude in dealing with employees." *Sterling v. Upjohn*

*Healthcare Services,* 299 Ark. 278, 772 S.W.2d 329, 330 (1989).

The workplace is not always a tranquil world where civility reigns. Personality conflicts and angst over disciplinary actions can be expected. Even a certain amount of arbitrary nastiness may be encountered at all levels in all occupations; this is a fact of life we must accept as readily as we recognize that employers and employees on the job interact differently than do friends at a summer picnic. If anxiety from management decisions were "deemed so severe that no reasonable person could be expected to endure it, nearly all employees would have a cause of action for intentional infliction of severe emotional distress." *Heying v. Simonaitis,* 126 Ill.App.3d 157, 81 Ill.Dec. 335, 342, 466 N.E.2d 1137, 1144 (1984). *See also Hooten v. Pennsylvania College of Optometry,* 601 F.Supp. 1151, 1155 (E.D.Pa. 1984) ("It is not enough ... to show that one has suffered emotional distress because of an intentional tortious act. Rather, the [employee] must show that the conduct complained of crossed the threshold of decency into a realm of atrocity that could only be regarded as utterly intolerable in a civilized society."); *Wells v. Thomas,* 569 F.Supp. 426, 429, 433 (E.D.Pa.1983) (Employee subjected to petty annoyances, including being told falsely that co-workers found her presence at staff meetings inhibiting, being the only managerial employee whose phone calls went unanswered, and having a phone line, a secretary, and her private office taken away. The court held, "This conduct, though intentional and perhaps highly inappropriate in view of [the employee's] long work history at the hospital, is not the type of extreme and outrageous conduct which Pennsylvania courts have recognized as giving rise to a cause of action."); *Leibowitz v. Bank Leumi Tr. Co. of N.Y.,* 152 A.D.2d 169, 548 N.Y.S.2d 513, 521 (2 Dept.1989) ("[T]he fact that we view the alleged conduct as being deplorable and reprehensible does not necessarily lead to the conclusion that it arose to such a level that the law must provide a remedy."); *Jones v. Tennessee Valley Authority,* 948 F.2d

258, 266 (6th Cir.1991) (Plaintiff claimed his supervisors intimidated him with menial assignments, unfair reprimands, a low performance appraisal, and efforts to obtain his medical records, and by monitoring his communications with federal officials and barring him from promotions, bonuses, and raises. "While such conduct may be tortious, it is not so 'outrageous' so as to be beyond the pale of decency. Indeed, tortious conduct is not necessarily synonymous with 'outrageous' conduct.").

### The Instant Case

Applying these principles to Weathersby's claim against KFC, we note initially that "[i]t is for the court to determine, in the first instance, whether the defendant's conduct [in an intentional infliction of emotional distress case] may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Restatement* § 46 cmt. h; *see Batson v. Shiflett*, 325 Md. at 734, 602 A.2d at 1216; *Harris v. Jones*, 281 Md. at 568, 380 A.2d at 615. We believe the trial court did not err in its decision.

■ There is no evidence that KFC knew that Weathersby's psychological makeup was other than that of any competent and industrious employee. We should not be read as suggesting that we in any way approve of Watts' or KFC's actions in this matter. *See Harris v. First Federal Sav. and Loan Ass'n*, 129 Ill.App.3d 978, 85 Ill.Dec. 89, 92, 473 N.E.2d 457, 460 (1984) (Although employer's conduct "may not [have been] laudable," it was not reprehensible enough to warrant a finding of intentional infliction of emotional distress.). Nevertheless, we agree with Judge Ferretti that there was no managerial misbehavior of the degree necessary for a successful claim under this tort theory. Had KFC known that Weathersby suffered from a personality disorder that could contribute to her stress, the result might have been different. But there was no evidence that KFC knew of Weathersby's particular vulnerability, and therefore its actions do not reach the level of outrageousness the tort requires.

The Court of Special Appeals noted that Weathersby "claims that there was evidence presented showing that [KFC] knew or should have known that the 'unfair discipline' to which she was subjected would deeply affect her, given her personality and work record.... [She points] out that ... she has shown that she was a devoted employee who took her job quite seriously, had progressed steadily along a career track for many years, and had otherwise manifested a high degree of integrity in the work place." 86 Md.App. at 554, 587 A.2d at 579. This, however, is not enough to subject an employer to liability. Were that the case, the more dedicated the employee, the more he or she would be considered emotionally vulnerable.

We announce no new principles in this decision. We apply the law of intentional infliction of emotional distress as we adopted it nearly 15 years ago in *Harris v. Jones.* Had Weathersby established that Watts or KFC knew of her particular emotional makeup and vulnerability and still behaved as she alleged, today's outcome might have been different. But there is no such evidence.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. RESPONDENT TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.

ROBERT M. BELL, J., dissents and files an opinion in which ELDRIDGE, J. joins.

ROBERT M. BELL, Justice, dissenting.

In *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977),[1] we adopted, as an independent tort, intentional

---

1. The issue arose in the employment context. The allegations were that Harris's supervisor harassed him on the job, making fun of his speech impediment. We did not need to decide the "outrageous" element since we held that the level of distress proven did not cross

infliction of emotional distress, with elements as enunciated in *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974):

(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe.

Speaking for the Court, Chief Judge Murphy, citing Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich.L.Rev. 874 (1939), explained

"that by closely adhering to the four elements outlined in *Womack*, two problems which are inherent in recognizing a tort of this character can be minimized: (1) distinguishing the true from the false claim, and (2) distinguishing the trifling annoyance from the serious wrong. (citation omitted).

281 Md. at 566, 380 A.2d at 614.

Within the context of adhering strictly to the elements of the tort, we recognized the difficulty of proving that a defendant's conduct is extreme and outrageous and, so, we adopted the standard of the Restatement (Second) of Torts, ch. 2, Emotional Distress, section 46, comment d (1965): liability will only be found where the conduct is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " 281 Md. at 567, 380 A.2d at 614. Thus, we made clear that "liability does not extend ... 'to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Id.* Dean Prosser, in his article, *Insult and Outrage*, 44 Calif.L.Rev. 40, 43–44 (1956), put it thusly:

*Extreme and outrageous conduct.* The first limitation which emerges from the decisions is that ... the independent liability for the intentional infliction of emotional

the threshold necessary to recover for the tort. *Harris v. Jones,* 281 Md. 560, 570, 380 A.2d 611, 616 (1977).

distress arises only in cases of what may be called extreme outrage. It has not been enough that the defendant has acted with the intention of causing the mental disturbance, or that he has intended to commit a tort, or even a crime, or that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages if another tort could be found. Liability has been imposed only in cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim 'Outrageous!' " (footnotes omitted)

Moreover, we said: "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as extreme and outrageous; where reasonable men may differ, it is for the jury to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." 281 Md. at 569, 380 A.2d at 615. *See also* Restatement, § 46, comment h; *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 91, 468 P.2d 216, 219 (1970).

In addition, we acknowledged that context is an important determinant of whether conduct is outrageousness: "[i]n determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." 281 Md. at 568, 380 A.2d at 615. Indeed, agreeing with comment e of § 46 of the Restatement, we asserted "that the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." 281 Md. at 569, 380 A.2d at 615. In that regard, we acknowledged with approval *Alcorn v. Anbro Engineering, Inc.*, 86 Cal.Rptr. at 90 n.

2, 468 P.2d at 218 n. 2, in which that Court declared: "a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a mere stranger to the defendants." 281 Md. at 569, 380 A.2d at 615. We stated particularly that "[i]n cases where the defendant is in a peculiar position to harass the plaintiff and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Id.*

Along with context, we recognized that "the personality of the individual to whom the misconduct is directed is also a factor," 281 Md. at 568, 380 A.2d at 615, as are the known susceptibilities and sensitivities of the victim of such conduct. 281 Md. at 567, 380 A.2d at 615. Thus, conduct which is otherwise neither extreme nor outrageous may become so when it is engaged in despite the actor's knowledge of its effect on the victim. *Id.*

Since the decision in *Harris,* our cases have recognized the importance of some of the principles *Harris* enunciated. *E.g. Batson v. Shifflett,* 325 Md. 684, 734–37, 602 A.2d 1191, 1216–17 (1992); *Figueiredo–Torres v. Nickel,* 321 Md. 642, 654–55, 584 A.2d 69, 75–76 (1991); *B.N. v. K.K.,* 312 Md. 135, 144–49, 538 A.2d 1175, 1179–82 (1988); *Young v. Hartford Accident and Indemnity Co.,* 303 Md. 182, 198–99, 492 A.2d 1270, 1277–78 (1985). Referring to context, we said, in *Batson:*

> As *Harris* explained, context is vital in determining whether the conduct is tortious. Here, the context was a heated labor dispute. Shifflett was a combatant, veteran labor leader who voluntarily entered an arena of public controversy and exchanged charges and countercharges with petitioners.... He acknowledged that labor union struggles are often "vicious." In fact, he made the first accusations in a flyer claiming that Batson was "either lying now ... or he lied under oath when he testified at the National Labor Relations Board." Petitioners' conduct was hardly "extreme and outrageous" in this context. (citations omitted)

325 Md. at 736–37, 602 A.2d at 1217. Conduct that is neither extreme nor outrageous may become so in the context of a special relationship between the parties. Thus, in *Nickel,* we commented:

> In addition to the allegations of sexual misconduct, Torres further alleges that ... Nickel "demoralized [Torres] by making statements and engaging in conduct that was destructive to [Torres'] ego development and self-respect ... by telling him he had bad breath and should not go near his wife, and by falsely and systematically telling [Torres] that the deterioration of [Torres'] relationship with his wife was exclusively the result of [Torres'] conduct." As we stated in *Harris,* " 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' " are insufficient to support a claim for intentional infliction of emotional distress.... Coming from a stranger, or even a friend, this conduct may not be outrageous; but we are not prepared to state as a matter of law that such behavior by a psychologist which takes advantage of the patient's known emotional problems is not extreme and outrageous conduct sufficient to support an intentional infliction of emotional distress claim. (citations omitted)

321 Md. at 655, 584 A.2d at 76. To the argument that engaging in consensual sexual intercourse with another adult, notwithstanding that she is married, is not outrageous and extreme, we noted that "Nickel's analysis neglects one important detail. Nickel was not the 'milkman, mailman, or the guy next door'; he was Torres' psychologist and marriage counselor." 321 Md. at 654, 584 A.2d at 75. (footnote omitted).

Although not explicitly addressed in *Harris,* it is nevertheless clear that the reasons for the actor's conduct are also important, *see Young v. Hartford Accident and Indemnity Company,* 303 Md. at 198–99, 492 A.2d at 1278; motivation is a part of context. In *Young,* the plaintiff alleged that the defendant insisted upon a further psychiatric examination of the plaintiff for the "sole purpose of"

harassing her to abandon her workers' compensation claim or to cause her to commit suicide. We held that, if the allegation were proven, then the defendant's conduct, conspiring with the physician to force the plaintiff to abandon her claim or commit suicide, could be found by a jury to be extreme and outrageous. 303 Md. at 199, 492 A.2d at 1278. Because the defendant had the right to obtain a further psychiatric examination, it was the defendant's motivation for seeking the examination, rather than the conduct, in and of itself, that rendered the conduct sufficiently egregious to support the tort of intentional infliction of emotional distress.

The employment relationship certainly is one in which one of the parties, by virtue of position, exerts actual or apparent authority over the other and thus may affect his or her interests. *See M.B.M. Company, Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681, 688 (1980) (recognizing "that there are cases in which the extreme and outrageous nature of the conduct arises not so much from what is done as from the abuse by the defendant of a relationship with the plaintiff which gives him power to damage the plaintiff's interests."); *Alcorn v. Anbro Engineering, Inc.,* 86 Cal.Rptr. at 90 n. 2, 468 P.2d at 218 n. 2 ("Thus, plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants."); *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 597 A.2d 846, 848 (1991) (quoting, with approval, Restatement, § 46, comment (e)); *White v. Monsanto Co.,* 585 So.2d 1205, 1209–1210 (La.1991) (same); *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173, 1176 (1977) ("When one in a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments, this abusive conduct gives added impetus to the claim of outrageous behavior.... The relationship between the parties is a significant factor in determining whether liability should be imposed." (citations omitted))

A defendant's liability for intentionally inflicting mental distress may be proven in either of two ways: (1) by showing that the defendant's intentional or reckless conduct is so extreme and outrageous as to have caused the plaintiff emotional distress, or (2) by showing that the conduct, neither extreme nor outrageous in and of itself, was engaged in with full knowledge of the plaintiff's sensitivity or susceptibility to that particular conduct.

Although focusing primarily on the latter, the majority holds that neither alternative was proven in this case. As to the former, purportedly agreeing "that the employment relationship is a factor to be considered when analyzing whether an employer's behavior was so outrageous that he or she has committed the tort of intentional infliction of emotional distress," at 678, the majority states "that there was no managerial misbehavior of the degree necessary for a successful claim under this tort theory." at 680. Addressing the latter, it holds that "[t]here was no evidence that KFC knew of Weathersby's particular vulnerability, and therefore its actions do not reach the level of outrageousness the tort requires." *Id.*

The majority does no more than give lip-service to the principles enunciated in *Harris*. It certainly does not apply them in the determination of whether reasonable persons could differ as to the outrageousness of the petitioners' conduct. The petitioners' knowledge, actual or imputed, of the respondent's predilection for emotional distress and the availability of that alternative basis for liability is not, for me, the critical or ultimate issue; the question on which the majority primarily focuses, "whether the defendant must have had knowledge of the plaintiff's delicate emotional state to be accountable in the instant case for causing her emotional distress?," at 670, should not have ended the analysis. The *Harris* principles should have been applied at the outset. The intermediate appellate court could have been right for the wrong reason.

In my opinion, the conduct of the petitioners was such that, at the very least, reasonable persons may differ as to

its outrageousness. Consequently, on that basis, if no other, the court properly submitted the case to the jury and erred when it granted the petitioners' motion for judgment *N.O.V.* The Court of Special Appeals, therefore, correctly reversed the judgment of the circuit court.

The review of the trial court's grant of the motion for judgment *N.O.V.* and the need to give flavor to the case presented to the jury, makes it necessary that the facts, in the light most favorable to the respondent, *see Delisi v. Garnett,* 257 Md. 4, 6, 261 A.2d 784, 785–86 (1970); *Lehman v. Baltimore Transit Company,* 227 Md. 537, 540, 177 A.2d 855, 857 (1962), be recounted in some detail.

The respondent was a training store manager at a Kentucky Fried Chicken (KFC) store in Wheaton, Maryland. Her immediate supervisor was Lee Watts, an area manager responsible for five KFC stores in the region. During her first month as manager of the training store, Watts, consistent with company policy, had the core locks changed in that store. Thereafter, notwithstanding that there were management changes at the store and company policy required core locks to be changed contemporaneous with such changes, that was the last time, prior to the respondent's transfer, that they were changed. Responsibility for changing the core locks was that of the area manager, not the store manager.

Also during her first month at the KFC store, the respondent suspected that Watts and Theresa Miller, one of her assistant managers, were involved in a romantic relationship. Such relationships are not condoned by KFC. She confronted Watts, telling him that, because of this relationship, she could not supervise Miller. She asked that Miller be transferred. Although Watts did not deny the relationship, he did not transfer Miller.[2]

---

**2.** The evidence presented to the jury included the basis for the respondent's suspicion: *inter alia,* an employee complained to the respondent that he or she had been fired by Watts, without an opportunity to present his or her side of the issue, following an argument with

Shortly after this confrontation, Watts began a campaign of harassment, which included reporting false customer complaints; requiring the respondent to place a large banner on the store's roof without the aid of a maintenance person; requiring the respondent to work long stretches without a day off; and, when she had a day off, calling the respondent at home insisting that she correct a problem at the store, which, when she arrived, she found not to exist. When Miller was out sick indefinitely, Watts assigned to the respondent assistant managers who were and, indeed, should have been known to be, poor workers. One such assistant manager, a former brother-in-law of one of the operations managers, had a history of drug abuse and was, when assigned to the respondent, in a rehabilitation program. The respondent was told of these facts only after he had been assigned.

On January 14, 1988, on the respondent's day off, the employee with the drug history opened the store and reported a theft to the respondent who, in turn, reported it to Watts. Since there was no forced entry apparent, suspicion focused on those who had keys to the store and the safe. Some days later, the respondent was told that she and two assistant managers had to take a polygraph test. When she objected to taking such a test, Watts and the operations manager insisted that she do so.

Thereafter, at a meeting at which KFC's regional security director was present, she was asked to recount what she told the polygraph operator. When she mentioned that she said that Watts knew that the core locks had not been changed and that Miller, with whom Watts was romantically involved, had returned her keys to Watts when she was transferred, Watts falsely accused the respondent of having

Miller; the same employee reported seeing Miller sitting on Watts's lap; other employees reported observing Miller rubbing Watts' belly and calling him "her 'big teddy bear' "; Miller bragged to the respondent about a dinner date she had with Watts; Miller told the respondent that Watts helped her with her paperwork; and Watts had asked the respondent to give Miller a better work schedule.

disobeyed his orders to change the core locks. The regional security director demanded that the respondent take another polygraph test, which she refused to do.

At a manager's meeting and in front of customers and employees, including Miller, Watts suspended the respondent for ten days pending an investigation of the theft. He also confiscated her store keys. The suspension, which was without pay, was harsher than the discipline, a written reprimand, recommended by the regional security director. Still later, the respondent was demoted to assistant manager because of "serious misconduct," as to the nature of which, she was only told that it related to her failure to do something that she should have, like changing the core locks. As a result of the demotion, the respondent lost $11,000.00 in salary. She was, moreover, assigned to another store managed by someone she once supervised. In a letter to the respondent, Watts stated, "As a result of our investigation it [was] determined that serious misconduct on your part resulted in a significant cash loss." The respondent, of course, denied being responsible for changing the core locks and accused Watts of having that responsibility, which he failed to meet and of retaliating against her for having complained about his romantic relationship with Miller.

Shortly after receiving the letter accusing her of serious misconduct, the respondent sought medical help and consulted a psychiatrist. Both doctors certified her inability to work and the certificates were submitted to the petitioners.

KFC store managers who have worked for 90 continuous days or more are entitled to receive short-term disability (STD) pay for up to six months, for excused absence due to illness. To qualify, the manager must submit a doctor's statement certifying the manager's inability to work. The employment manual contains no provision requiring a second opinion for STD payments to accrue. Nevertheless, the petitioners required the respondent to obtain a second opinion from a doctor of the petitioners' choice, before it would pay STD. And, of course, they made no such payments to

the respondent until the opinion was received. When, finally, the respondent submitted to the petitioners' demand that she be examined by a psychiatrist of the petitioners' choice, that psychiatrist's diagnosis confirmed that of her psychiatrist, as well as the necessity for her hospitalization for six weeks beginning in March, 1988. Even when the petitioners made the STD payments, it did so at an assistant manager's rate and, then, for only part of the period of the respondent's incapacitation.

The majority asserts that it does not wish to "lower the threshold for determining liability whenever the parties are employer and employee. The conduct must still reach the same degree of outrageousness if an employee is to prove his or her employer has committed this tort; the employment relationship is merely one factor among many to use in analyzing individual cases." at 678. Unfortunately, other than that the misbehavior, in this case, is not such as "would ordinarily cause the degree of severe emotional distress necessary for a successful claim under this tort theory," at 680, and that, lest there be a proliferation of actions for intentional infliction of severe emotional distress, "a certain amount of arbitrary nastiness" is a fact of life which must be accepted by all employees, at 679, we are not given any reasoned basis for the conclusion that, in the employment context, a reasonable person could not find the subject conduct "outrageous." Neither do the courts, in the cases cited by the majority.[3] None of them, including this case, mentions, as a factor, the reasons the conduct was engaged in.

The petitioners' position, adopted by the majority, like that of the Arkansas Supreme Court, is to take "a strict view of claims for outrage in employment situations ... because an employer must be given a certain amount of

---

**3.** *See Hooten v. Pennsylvania College of Optometry,* 601 F.Supp. 1151, 1155 (E.D.Pa.1984); *Wells v. Thomas,* 569 F.Supp. 426, 429, 433 (E.D.Pa.1983); *Leibowitz v. Bank Leumi Trust Company of New York,* 152 A.D.2d 169, 548 N.Y.S.2d 513, 521 (2 Dept.1989); *Jones v. Tennessee Valley Authority,* 948 F.2d 258, 266 (6th Cir.1991).

latitude in dealing with employees." *Sterling v. Upjohn Health Care Services, Inc.*, 299 Ark. 278, 772 S.W.2d 329, 330 (1989) (citations omitted). *See also Ingram v. Perelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103, 105 (1988) (citing *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). I do not disagree with that proposition in a vacuum. But it is not in a vacuum that this case must be decided. Here, the employment situation has passed being a little arbitrary, as where a supervisor, for all of one minute berated the plaintiff, using profanity, *see White v. Monsanto Co.*, 585 So.2d at 1210–11, or where management questions the plaintiff's job performance or transfers him or her for legitimate disciplinary or management purposes, *see Heying v. Simonaitis*, 126 Ill.App.3d 157, 81 Ill.Dec. 335, 341–42, 466 N.E.2d 1137, 1143–44 (1984), and taken on the aspect of a planned course of conduct the specific purpose and result of which necessarily may, and most probably will, involve the infliction of severe emotional distress. The conduct, in my opinion, amounts to more than insults or indignities.

There was, in this case, a special relationship between the respondent and the petitioner: that of employer and employee. And, with regard to Watts, it was supervisor and supervisee. The petitioners, and more specifically, Watts, were in a unique position to affect the respondent's interests. They had a particular advantage over the respondent. In this day and age, there is no meaningful choice between quitting one's job and tolerating abuse on the job. She was not in a position to go toe to toe, and pass blow for blow, with her employer.[4] *Harris* tells us that we should careful-

---

**4.** *Batson v. Shifflett*, 325 Md. 684, 734–37, 602 A.2d 1191, 1216–17 (1992) is the converse of this case. Because of context, there was not a sufficient showing, at the threshold, that the tort occurred. I believe *Batson* supports my position, not the majority's. It was because the conduct of the defendant and, indeed, of the plaintiff, occurred during a heated labor dispute, never a nice, simple walk in the park, that we held that the plaintiff never crossed the threshold. I joined in the decision for that reason. This is the gentility of the fast food business, not the rough and tumble of the labor union brawl.

ly scrutinize the relationship in the context in which it occurred. The conduct of the employer may be extreme and outrageous by virtue of the employer's abuse of the relation with the employee. Prosser, *Insult and Outrage,* 44 Calif.L.Rev. at 47.

An employer, of course, has the legal right to speak harshly to its employees at times, to insist upon its employees performing unpleasant duties, at times, and to expect its employees to endure some arbitrariness and unfairness, and perhaps even to ask that they submit to polygraph tests under appropriate circumstances, *but see Townsend v. L.W.M. Management, Inc.,* 64 Md.App. 55, 494 A.2d 239, *cert. denied,* 304 Md. 300, 498 A.2d 1186 (1985); *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985). An employer does not have the right, however, to scheme against its employee for the purpose of forcing that employee out of her job or just to harass that employee. There is a significant difference between giving an employer a certain amount of latitude to deal with an employee when the employer's purpose is largely for the benefit of the business. It is quite another thing when the purpose of the employer's conduct is illegal or improper. As *Young* teaches us, behavior undertaken for an improper purpose may be just the kind of outrageous conduct that the tort of intentional infliction of mental distress seeks to reach.

The petitioners' conduct in this case is more than a mere insult, a petty oppression, or triviality. On the contrary, initially the petitioners, through Watts, the respondent's supervisor, concocted a plot, a vendetta, if you will, premised, perhaps, on the theory that the best defense is a good offense, for the purpose of forcing her out of her job or, failing that, to so humiliate her that she would never again deign to question his behavior or report his indiscretions or violations of company policy. When it became known that the supervisor's conduct had caused her emotional distress, had affected her to the point that she was disabled and that disability became manifest—the petitioners were made

aware of its effect—rather than avoiding conduct which would exacerbate the distress, the petitioners did just the opposite; before making disability payments to which the medical documentation showed the respondent to be entitled, the petitioners insisted upon the fulfillment of a condition not required of others.[5] That insistence, the respondent maintains, was for the purpose of further harassing her.

The petitioners may very well be correct that the conduct of the petitioners undertaken through *Watts*, initially, was engaged in without any knowledge of any sensitivities or susceptibilities that the respondent might have had. When the petitioners were advised, however, of the respondent's disabilities, including her hospitalization and, presumably, the diagnosis, they were on full notice that, from that time forward, they should tread lightly. They did not heed the warning. The petitioners, as a matter of legal right, could have insisted upon a second opinion by a psychiatrist of its choice, as was the case in *Young, supra;* the respondent, however, has alleged that that was not the petitioners's purpose for failing to pay and insisting on a second opinion. Rather, it was to further the harassment to which she had already been subjected. Consequently, as in *Young*, it was for the jury to determine the character of the conduct.

The jury, as it was required to do, carefully scrutinized the petitioners' conduct vis-a-vis the respondent, including its motivation, and concluded that, in the context of an employer-employee relationship, it was sufficiently outrageous to support an intentional infliction of emotional distress suit. The same careful scrutiny should have led the majority to the conclusion that the court properly submitted the issue to the jury. It is the entirety of the circumstances, including the context in which the conduct

---

5. There was evidence that when Miller, the assistant manager romantically involved with Watts called in sick, she was not required to get a second medical opinion, not to mention, to be examined by a doctor of the petitioner's choice.

occurred, including its motivation, that must be reviewed. That being done, an objective and reasonable observer would certainly exclaim, "Outrageous!" *See Prosser, supra;* Restatement, § 46, comment d. The jury's determination should not have been disturbed.

In its conclusion, the majority states:

We announce no new principles in this decision. We apply the law of intentional infliction of emotional distress as we adopted it nearly 15 years ago in *Harris v. Jones.* Had Weathersby established that Watts or KFC knew of her particular emotional makeup and vulnerability and still behaved as she alleged, today's outcome might have been different. But there is no such evidence. [At 681.] These observations, though interesting, are belied by today's decision.

When *Harris* was decided 15 years ago, it clearly contemplated: that context, including motive, would be an important determinant of whether conduct which otherwise would not be, is extreme and outrageous enough to support the tort; that there should be a significance in the employer-employee relationship, which does not exist in stranger-to-stranger encounters; that the court's threshold determination should be only whether the conduct may *reasonably* be regarded as outrageous, the decision on the merits being reserved for the jury; and that conduct may be outrageous because of the abuse of a position which gives the actor actual or apparent authority over his or her victim. Until today, those principles were both recognized *and applied* in our cases. As recently as *Batson, supra,* we gave full effect to context, denying recovery on that basis. Today, just a few months later, still paying lip-service to the principles, we totally abandon them in practice.

By purporting to leave the door open for the application of the tort in future cases, the majority perpetrates a cruel hoax. The message that comes through in the case, and, I believe, is intended, is that the tort of intentional infliction of emotional distress does not exist in the employer-employ-

ee context; the limitations the majority places on the tort are such that it is virtually inconceivable that any employment case will ever qualify. Furthermore, the tenor of the opinion suggests that the tort is disfavored to the point that it is not likely to be found to exist in any significant number of factual situations outside the employment context. Therefore, under the circumstances, it is better, in my opinion, that they bury the tort now, quickly and permanently, acknowledging, perhaps, that they made a mistake. The few cases, if any, to which it may have future application will hardly be worth the costs of litigating them. Moreover, delay of the inevitable simply means that the hopes of many future litigants will be unnecessarily dashed.

I dissent.

ELDRIDGE, J., joins in the views expressed herein.